JM:DCW

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**12 M 621**

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

AUBREY LEE PRICE,

        Defendant.

- - - - - - - - - - - - - - - - -X

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF ARREST
WARRANT

(18 U.S.C. § 1343)

EASTERN DISTRICT OF NEW YORK, SS:

    MICHAEL HOWARD, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    In or about and between January 2011 and June 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AUBREY LEE PRICE, having devised a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses and representations, did knowingly and intentionally transmit and cause to be transmitted writings, signs, signals, pictures and sounds by means of wire communication in interstate and foreign commerce for the purpose of executing said scheme and artifice.

    (Title 18, United States Code, Section 1343)

    The source of my information and the grounds for my belief are as follows:

1. I have been a Special Agent with the FBI for more than four years. The facts set forth in this affidavit are based in part on information provided to me by employees of the Federal Deposit Insurance Corporation ("FDIC"), including law enforcement officers, interviews with witnesses, and from my review of various documents obtained by subpoena, request or database searches.

2. Because this Affidavit is being submitted for the limited purpose of seeking an arrest warrant, I have not set forth each and every fact learned during the course of the investigation, but simply those facts which I believe are necessary to establish probable cause to support the issuance of an arrest warrant for defendant AUBREY LEE PRICE.

## Introduction

3. As described in further detail below, there is probable cause to believe that between January 2011 and June 2012, the defendant, AUBREY LEE PRICE, committed wire fraud. Specifically, while PRICE was a director of a bank (hereinafter referred to as "the Bank"), he caused approximately $21 million of money belonging to a subsidiary of the Bank to be sent to certain securities accounts. PRICE then falsely represented the account balances in the securities accounts to conceal his theft of bank funds and/or his trading losses.

4. At all times relevant to this Complaint, the defendant, AUBREY LEE PRICE, owned a home in Valdosta, Georgia, and also appears to have owned a home in Bradenton, Florida.

2

5. At all times relevant to this Complaint, the Bank was a Georgia company with its principal places of business in Ailey and Vidalia, Georgia. The Bank is the bank holding company for a Georgia state-chartered bank which is a wholly owned subsidiary of the Bank (hereinafter referred to as "the Bank Subsidiary") and operates through branches located in Vidalia and Ailey, Georgia.

6. On or about December 31, 2010, the Bank and the Bank Subsidiary raised about $14 million through the combination of a sale of common stock to PFGBI, LLC ("PFGBI"), a newly-created bank holding company comprised of individual investors, and a private placement to other investors. The defendant, PRICE, was the manager of PFGBI.

7. As a result of the infusion of capital by PFGBI into the Bank and the Bank Subsidiary, PFGBI acquired a controlling interest in the Bank. Indeed, in about January 2011, PRICE became a director of both the Bank and the Bank Subsidiary. Additionally, PRICE began to manage the Bank Subsidiary investment portfolio.

8. Between January and March 2011, PRICE reported to members of executive management and the Board of Directors of the Bank and the Bank Subsidiary that he had opened trading accounts at a large financial services firm for the purpose of investing funds on behalf of the Bank Subsidiary. PRICE represented to members of executive management at the Bank Subsidiary that the bank's funds

3

would be invested in United States Treasury securities. At no point did PRICE indicate that he would invest in option securities.

9. In about or before 2011, PRICE opened accounts, which he controlled, in the name of PFG LLC, PFG Short-Term Income Fund, LLC, and The Montgomery Growth Fund, LLC (the "Price accounts") at a securities broker-dealer (the "broker-dealer") other than the large financial services firm where PRICE had claimed he would invest the Bank Subsidiary's funds. The Price accounts were then introduced to a separate clearing firm in New York (the "clearing firm") which acted as the clearing broker for the Price accounts. The clearing firm in question was associated with the large financial services firm where PRICE claimed he had opened trading accounts for the purpose of investing funds on behalf of the Bank Subsidiary.

10. Between approximately January 2011 and May 2012, representatives of the Bank Subsidiary wired more than $21 million to the Price accounts. This was generally done at the direction of PRICE. For example, on or about December 2, 2011, PRICE sent an email to an employee of the Bank Subsidiary, in which he instructed the employee to wire $2.5 million in the Bank Subsidiary's funds to an account in the name of the clearing firm at a bank in New York City. The employee believed that the $2.5 million dollars that she was wiring to the clearing firm would be invested by PRICE on behalf of the Bank Subsidiary.

11. PRICE also sent members of executive management at the Bank Subsidiary purported account statements for accounts at the clearing firm in the name of the Bank Subsidiary. For example, on June 7, 2012, PRICE emailed an account statement for an account in the name of the Bank Subsidiary that was purportedly at the clearing firm. The account statement showed that the value of the Bank Subsidiary's purported account at the clearing firm was more than $17 million.

12. In or about June 2012, members of executive management at the Bank Subsidiary heard a rumor that PRICE had committed suicide. Moreover, Bank Subsidiary executives received information from persons associated with PRICE that he had possibly embezzled money from PFG LLC.

13. In or about June 2012, employees of the Bank Subsidiary provided to the clearing firm, through the broker-dealer and state banking regulators, copies of account statements that had been provided by PRICE and which showed that the Bank Subsidiary purportedly had accounts at the clearing firm with a value of up to approximately $17 million. In response, representatives at the clearing firm reported to the Bank Subsidiary that it had not prepared the account statements. Indeed, employees of the clearing firm have informed me that there was no account in the name of the Bank Subsidiary at either the broker-dealer or the clearing firm. Additionally, contrary to account statements provided by PRICE

5

which showed as much as approximately $17 million in the Price accounts, most of the funds in the Price accounts had been wired out of the Price accounts to other accounts in the name of PFG LLC. I learned from the clearing firm that PRICE identified himself in account opening documents as a General Partner and Portfolio Manager of PFG LLC. Additionally, I learned from the clearing firm that equity and option securities had been traded in the Price accounts.

14. Also in or about June 2012, employees of the Bank Subsidiary provided to the clearing firm, through the broker-dealer and state banking regulators, a letter dated April 19, 2012, that had purportedly been sent to the Bank Subsidiary's external auditor by "James Franklin," a purported Senior Vice-President at the clearing firm. Attached to this letter was a purported account statement dated December 31, 2011, for an account at the clearing firm in the name of the Bank Subsidiary. I have learned from the clearing firm that there is no person named James Franklin employed at the clearing firm and that the clearing firm did not prepare the letter.

15. On or about Monday, June 18, 2012, several persons received letters from PRICE. In at least one of those letters, PRICE stated that he had lost a large sum of money through his trading activities. PRICE also indicated that he planned to commit suicide.

16. Through conversations with a Special Agent with the FDIC Office of Inspector General, I have learned that PRICE told others that he planned to kill himself off the coast of Florida by jumping off a ferry boat. Despite a recent search by the Coast Guard, PRICE's body has not been recovered.

17. Through conversations with law enforcement officials and others, I have learned that PRICE has previously stated that he owns real estate in Venezuela and that he frequently traveled to Venezuela and Guatemala. Indeed, airline records show that PRICE returned to the United States from a trip to Venezuela on June 2, 2012. Moreover, I have learned that PRICE may own a boat that would be large enough to travel to Venezuela from Florida.

WHEREFORE, Your affiant respectfully requests that the Court issue an arrest warrant for the defendant AUBREY LEE PRICE so that he may be dealt with according to law.

_____
Michael Howard
Special Agent
Federal Bureau of Investigation

Sworn to before me this
28th day of June, 2012

S/Pohorelsky

THE HONORABLE ... RELSKY
UNITED S... GE
EASTERN D...

7